## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRYSTINA A., | : | CIVIL ACTION |
| **Plaintiff,** | : | |
| | : | |
| vs. | : | NO.   25-cv-4759 |
| | : | |
| FRANK BISIGNANO, | : | |
| Commissioner of Social Security, | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                    **March 27, 2026**

Plaintiff Chrystina A. brought this action seeking review of the Commissioner of Social Security Administration's decision denying his claim for Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 10) is **GRANTED.**

## I.     PROCEDURAL HISTORY

Plaintiff initially protectively filed for SSDI and SSI on August 10, 2022, alleging disability since January 30, 2020, due to mental illness, anxiety, attention deficit hyperactive disorder (ADHD), posttraumatic stress disorder (PTSD), Asperger's syndrome, and depression. (R. 76, 250).  His[1] applications were denied at the initial level and upon reconsideration, and he requested a hearing before an ALJ.  (R. 116-25, 132-41, 143-44).  Plaintiff, represented by

---

[1]  "Plaintiff is a transgender male who prefers to be . . . refer[red] to . . . using 'he/him' pronouns."  (Pl.'s Br., ECF No. 10, at 2 n.1).

counsel, and a vocational expert (VE) testified at the July 10, 2024, administrative hearing.  (R. 37-75).  On August 5, 2024, the ALJ issued a decision unfavorable to him.  (R. 14-36).  He requested review by the Appeals Council, which was denied on June 20, 2025, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (R. 1-6).

On August 19, 2025, Plaintiff filed a complaint in this Court and consented to my jurisdiction pursuant to 28 U.S.C. § 636(C) the next day.  (Compl., ECF No. 1; Consent Order, ECF No. 4).  On December 15, 2025, he filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 10).  The Commissioner filed a Response on January 14, 2026, and on January 28, 2026, Plaintiff filed a Reply.  (Resp., ECF No. 11; Reply, ECF No. 12).

## II.      FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.[2]

Plaintiff was born on June 4, 1997, and was 22 years old on the alleged disability onset date.  (R. 30).  He has a high school education.  (R. 251).  His past relevant work includes jobs as a cashier, clerk, customer service associate, and online pick-up team member.  (R. 30, 240).

### A.      Medical Evidence

Plaintiff treated with Family Service Association of Bucks County for his mental health issues.  He presented to Barry Rebeck, M.D., on June 22, 2022, and was "very scattered" and "hard to follow."  (R. 442).  Notwithstanding this, he reported that he had been abused by his father during childhood, which had resulted in occasional anxiety attacks triggered by arguing,

---

[2]  Because Plaintiff's claim revolves around his mental capabilities, the Court addresses only the evidence implicating that functionality.

loud noises, past memories, meeting new people, and pressures in a work setting.  (R. 442-43).

He also reported depressive episodes and suicidal thoughts without planning.  (R. 442).  Plaintiff

was noted to be moderately depressed based on certain markers.[3]  (R. 444).  Upon examination,

Dr. Rebeck observed Plaintiff: was appropriately dressed and groomed; was pleasant and

cooperative with a full range of affect; and showed fair insight and good judgment; but had

tangential thought process; displayed poor eye contact; had impaired recent memory but good

remote memory; and had problems with attention, concentration, and focusing.  (R. 445-46).  He

further noted that Plaintiff "present[ed] with problems connecting and listening" to others, was

"highly anxious," and described multiple depressive episodes lasting more than two weeks,

although he tended to minimize symptoms related to those episodes.  (R. 448).

Plaintiff again presented to Dr. Rebeck on July 20, 2022.  Dr. Rebeck observed that he

was "fairly stable" but also that his "presentation remain[ed] odd."  (R. 450).  Based on certain

markers, Dr. Rebeck categorized his depression over the prior two weeks as mild.  (R. 451).

Upon examination, Dr. Rebeck observed that Plaintiff: was appropriately groomed, pleasant, and

cooperative; displayed logical and goal-directed thought processes; had good memory; was

oriented to person, place, and time; and displayed fair judgment and insight; but displayed poor

eye contact and anxious mood with, at times, a "strange" affect.  (R. 453-54).  At this visit,

Plaintiff reported improvement in his ability to concentrate, focus, and pay attention.  (R. 455).

In October 2022, Plaintiff reported a more stable mood, better sleep habits, and that "it

was easy for [him] to remain on task without getting side-tracked."  (R. 457).  Based on certain

---

[3]  As part of Dr. Rebeck's care of Plaintiff during the course of their treating relationship, he conducted frequent psychological evaluation surveys to better understand and quantify the level of Plaintiff's depressive symptoms.  (*See., e.g.*, R. 444).  Plaintiff was directed to provide scored answers (between zero and three) to 10 different questions pertaining to how he felt and his mental function, with higher scores reflecting greater issues stemming from his mental health impairments.  (*Id.*).  Based on a cumulative totaling of Plaintiff's answers, his depression was assessed as minimal, mild, moderate, or moderately severe.  (*Id.*).

markers, Dr. Rebeck again noted his depression over the prior two weeks was mild.  (R. 458).

He noted largely normal mental examination findings save for a mildly depressed mood.  (R.

460-61).  In December 2022, Plaintiff reported slipping into a depressive state due to holiday

stresses.  (R. 464).  Moreover, his current medication (Concerta) was not as effective as it was

initially, making it harder to remain on task.  (*Id.*).  His depressive symptoms continued to be

mild, and Dr. Rebeck again noted normal mental status examination findings.  (R. 465-68).

Throughout most of 2023, Dr. Rebeck recorded mostly normal findings and observations with

occasional moderate to severe depressive symptoms, based on certain markers.  (*See, e.g.*, R.

476, 481, 484, 492-93, 642, 645, 650).  However, on October 30, 2023, Plaintiff reported that

dating back to August he had begun to feel depressed, lacked motivation and interest, was

sleeping a lot, and spent most of his time in bed.  (R. 649).  He also had stopped taking his

medication for approximately two months prior to this visit.  (*Id.*).  Based on certain markers, his

depressive symptoms over the prior two weeks fell in the moderate range, though before that he

had reported symptoms that fell in the "moderately severe" range.  (R. 650).  Upon examination,

Dr. Rebeck observed: his mood was depressed and anxious, though improving since recently

restarting his medication; his thought process was logical and goal-directed; he had good

memory and fair judgment and insight; and he was oriented to person, place, and time.  (R. 653).

Plaintiff confirmed he felt better in November 2021 after restarting his medication, and his

mental status examination results at that visit were normal.  (R. 657, 661).  On January 5, 2024,

Plaintiff reported to Dr. Rebeck that "various situational stressors" were presenting challenges to

his mood and that he no longer was treating with a therapist.  (R. 665).  However, mental status

examinations throughout the next several months remained largely normal.  (*See, e.g.*, R. 677-78,

685).

On July 3, 2024, Dr. Rebeck provided a medical assessment of Plaintiff's abilities to perform work-related activities.  (R. 724-26).  He opined that Plaintiff: was seriously limited in his ability to remember work-like procedures; understand, remember, and carry out very short and simple instructions; make simple work-related decisions; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in a routine work setting; and was unable to meet competitive standards in his ability to maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; interact appropriately with the general public; and deal with normal work stress.  (R. 724).  He further opined that based on Plaintiff's mental impairments, he had a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life, and that he would be absent from work more than three days per month.  (R. 725-26).  In coming to this conclusion, Dr. Rebeck further explained that Plaintiff "comes to the clinic receiving both med management and individual therapy," and that he was "easily distracted" and "socially inappropriate," his "thinking can be disorganized and illogical," he had "problems with paying attention, concentrating, focusing, [and] completing tasks," and his "mood tends to fluctuate."  (R. 725).

In August 2022, Plaintiff presented to the Jefferson Health emergency department complaining of off and on headaches over the prior few weeks along with anxiety.  (R. 561). Upon examination, he was alert with normal thought content and judgment.  (R. 563).  He was prescribed Lexapro and directed to return in six weeks.  (*Id.*).  At his follow-up in September

2022, Plaintiff reported feeling good with a stable mood and denied any adverse side effects from Lexapro.  (R. 581).  He also reported he was comfortable with his current therapist.  (*Id.*).

Plaintiff was noted to have transmasculine gender identity and has participated in gender affirming care since April 2023.  (R. 530).

On February 7, 2023, State agency consultative examiner Gregory Kramer, Ph.D., conducted a mental status evaluation of Plaintiff.  (R. 425-36).  He noted Plaintiff's history of treatment for his mental impairments, including several hospitalizations throughout his childhood followed by continuing outpatient care, his various diagnoses, weekly therapy and monthly medication management, and his need for special education services during school.  (R. 425-26).  Upon examination, Kramer observed that Plaintiff: was cooperative; displayed an "adequate" manner of relating and appropriate eye contact, though appeared anxious; was dressed casually and displayed "satisfactory" hygiene and grooming; had coherent and goal-directed thought processes with a clear sensorium, intact attention and concentration, and average cognitive function; was oriented to person, place, and time; had mildly impaired memory skills; and showed fair insight and judgment.  (R. 427-28).  Plaintiff reported that he could dress, bathe, and groom himself, prepare meals, do some cleaning around the house, do laundry and shop for groceries (though he attempts to avoid crowds), manage his own money, and take public transportation.  (R. 428).  Kramer diagnosed him with PTSD, ADHD, and autism spectrum disorder and noted his prognosis was fair.  (*Id.*).  He opined that Plaintiff: had mild limitations in his ability to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions; had moderate limitations in his ability to interact appropriately with others; and marked limitations in his ability to respond appropriately to usual work situations and to changes in a routine work setting.  (R. 430-31).  He further noted that Plaintiff had "focus issues."  (R. 430).

On February 10, 2023, State agency psychological examiner John Gavazzi conducted a mental status evaluation of Plaintiff.  (R. 80-85).  He noted Plaintiff had the following severe mental impairments: depressive, bipolar and related disorders; anxiety and obsessive-compulsive disorders; autism spectrum disorder; trauma- and stressor-related disorders; and ADHD.  (R. 80). Moreover, he acknowledged Plaintiff's symptoms, which included issues with understanding and memory, sustained concentration and persistence, and social interaction.  (R. 82).  He opined that based on these impairments, Plaintiff was limited in the following ways: he was mildly limited in his ability to concentrate, persist, or maintain pace; and moderately limited in his abilities to accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting.  (R. 81, 83).  Gavazzi noted that Plaintiff "can perform one- or two-step, routine tasks in a stable environment."  (R. 83).  He further clarified that "[a]vailable data" suggested that Plaintiff possessed "adequate ability" to "respond to basic work setting changes," avoid hazardous situations, use transportation, and "organize and set simple goals."  (*Id.*).

Upon reconsideration on July 7, 2023, State agency psychological examiner Dawn Long noted the same severe mental impairments and opined that Plaintiff was mildly limited in his ability to understand, remember, or apply information and moderately limited in his abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept

7

instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting. (R. 99, 101-02). Long also found that Plaintiff could "understand, retain, and follow simple instructions (i.e., perform one and two step tasks)," and that he could "make simple decisions and would not require special supervision in order to sustain a work routine." (R. 102).

### B.    Non-Medical Evidence

Plaintiff testified at the July 10, 2024, administrative hearing that he lives with his mother, stepfather, and brother. (R. 46). He stated that he has a non-driver's identification, and that he has not sought to obtain a driver's license for several reasons, including that his anxiety makes it difficult for him to learn. (R. 47). He noted that he completed high school and attended the Art Institute of Philadelphia for one month before dropping out. (R. 48). Plaintiff noted that he worked for Walmart in 2021 "in the back of the store doing online grocery pickup." (R. 50). He eventually was let go from that job for calling out of work too many times due to anxiety. (R. 51). He noted the same issue arose in his employment with a staffing firm he worked for during that same timeframe. (R. 51-52). In 2022, Plaintiff worked for Giant as a cashier for about a month. (R. 49-50). He also worked at McDonald's during that same timeframe but ultimately quit that job due to anxiety regarding the working conditions there. (*Id.*).

When the ALJ asked Plaintiff why he believed he was unable to work since January 2020, Plaintiff highlighted that he had submitted over 200 applications for various jobs "thinking [he] would get one," but that he had been unsuccessful. (R. 53). He suggested that perhaps his lack of transportation may have played a role in his inability to secure employment. (*Id.*). He also attempted to pursue a singing career by auditioning for American Idol, but was

8

unsuccessful.  (R. 64).

Regarding his mental health issues, Plaintiff testified that he suffered frequent anxiety attacks (oftentimes accompanied by nausea and headaches) every few weeks and depressive episodes that could last more than a month and were so bad that he could not pull himself out of bed.  (R. 53-54).  Plaintiff testified that his anxiety attacks were usually brought on by feeling "too overwhelmed."  (R. 54).  He had a fear of social situations, in part due to his inability to read social cues.  (R. 66-67).  Plaintiff also testified that he experienced PTSD based on events from his teen years.  (R. 68-69).

He testified that given his mental health issues, his life was "a little chaotic."  (R. 56).  He was able to complete certain household tasks, though he required somebody "watching over" him to keep him on task.  (R. 55).  However, he "usually just stay[ed] holed up in [his] room." (R. 56).  Plaintiff testified that he experienced hyper-fixation during his depressive episodes where he became singularly focused and had no concept of time.  (R. 63).  He also struggled to maintain his personal hygiene at times.  (R. 61).

Regarding his care, he noted that often he would report to his medical care providers and counselors that he was "fine" even though he was not.  (R. 57).  He reported that he was hospitalized several times throughout his teen years, including twice for inpatient care.  (R. 58). One of his coping mechanisms was to utilize fidget spinners, smooth rocks, and other small items to temper his stress and anxiety.  (R. 58-59).

Plaintiff's mother completed a third-party adult function report on October 23, 2022.  (R. 259-68).  She indicated that: due to Plaintiff's autism, he was unable to understand social cues; Plaintiff's ADHD prevented him from focusing, sitting still, or completing tasks; his anxiety affected his ability to handle crowds and stressful situations; his PTSD made it very difficult to get along with others; and generally his impairments made it difficult to get work done and to

9

sleep. (R. 259). She noted Plaintiff's activities of daily living (ADLs) included: reading; using the computer; talking with friends; preparing meals; doing laundry and engaging in other household chores; and occasionally taking care of his cat. (R. 260-61). According to her, Plaintiff needed significant reminders to complete household tasks and did not handle excess money very well. (R. 261-62). Ultimately, she noted that Plaintiff's impairments affected his ability to stand, sit, talk, hear, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. (R. 264). Further, she opined that Plaintiff: could not pay attention or stay on task for even five minutes; required extremely specific written instructions; had no ability to follow spoken instructions; and could not handle stress. (R. 264-65).

## III.    ALJ'S DECISION

Following the administrative hearing, the ALJ issued a decision in which she made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2026 (Exhibit 3D).

2.    The claimant has not engaged in substantial gainful activity since January 30, 2020, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: depressive disorder, anxiety disorder, Asperger's syndrome, attention deficit hyperactivity disorder (ADHD), posttraumatic stress disorder (PTSD), and gender dysphoria (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR

10

Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant can understand, remember, and carry out simple instructions; can use judgment to make simple work related decisions; can tolerate occasional interaction with the public, coworkers, and supervisors; and can deal with occasional changes in a routine work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 4, 1997, and was 22 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from January 30, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 19-31).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 31-32).

## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work.  If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four.  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work

experience, and mental and physical limitations, he is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.   DISCUSSION

In his request for review, Plaintiff raises three claims, including that the ALJ erred: (1) in rejecting the opinion of Dr. Rebeck; (2) in rejecting the opinion of Kramer; and (3) by failing to incorporate all of plaintiff's credibly established limitations in her RFC finding and hypothetical question posed to the VE. (Pl.'s Br., ECF No. 10, at 4-19).

### A.   Medical Opinion Evidence[4]

#### 1.   The Parties' Positions

Plaintiff first observes that, as confirmed by the VE, Dr. Rebeck's opinion—including his conclusion that Plaintiff would miss more than three workdays monthly and that he was "unable to meet competitive standards" in maintaining attention and focus, interacting with others,

---

[4] Given the related nature of Plaintiff's first two claims, I analyze them together.

performing at a consistent pace, and completing a normal workday—would be work-preclusive. (Pl.'s Br., ECF No. 10, at 7-8 (citing R. 73-74)).  He then contends that the ALJ erred in rejecting this opinion for multiple reasons, including that the ALJ: (1) wholly failed to consider the "serious and persistent" nature of Plaintiff's mental impairments; (2) failed to address certain supporting explanations provided by Dr. Rebeck; (3) cherry-picked the evidence concerning Dr. Rebeck's mental status examination treatment notes when evaluating supportability; (4) failed to consider whether the opinion was consistent with that of Kramer or with nonmedical evidence such as he and his mother's hearing testimony; and (5) failed to assign additional persuasive force to the opinion based on Dr. Rebeck's treating relationship with Plaintiff and specialization. (*Id.* at 6-14).

Next, Plaintiff asserts that the ALJ failed to properly consider supportability and consistency in rejecting Kramer's opinion that Plaintiff was markedly limited in his ability to respond appropriately to usual work situations and changes in a routine work setting.  (*Id.* at 15-19).  As to supportability, Plaintiff argues that "[t]he ALJ's reliance on Plaintiff's 'ability to engage in examination and his ability to relate and exchange information in a coherent manner' is misplaced, as this ability does not equate with an ability to respond appropriately to workplace changes and situations, which do not occur in a therapeutic setting." (*Id.* at 17).  He cites *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000), for the proposition that "a medical opinion that a patient's 'ability to function is seriously impaired or nonexistent in every area related to work shall not be supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting.'" (*Id.*).  In other words, he submits the ALJ "myopic[ally] focus[ed]" on the normal mental status reports cherry-picked from the record to the exclusion of other evidence (including abnormal mental status reports) that illustrated Plaintiff's severe disability.  (*Id.*).

14

Turning to consistency, Plaintiff reiterates his contention that the ALJ did not specifically consider that the opinions of Dr. Rebeck and Kramer were consistent with each other as well as his and his mother's testimony. (*Id.* at 18). In addition, Plaintiff contends that the ALJ's claim that he showed "symptomatic improvement with medication compliance" was inconsistent with Dr. Rebeck's notation that "symptoms have not stabilized," leading him to increase Plaintiff's medication. (*Id.* (citing R.470)).

Plaintiff argues that these failures and omissions are pertinent for two reasons. First, he maintains that had the ALJ correctly considered (and therefore accepted) Dr. Rebeck's opinion, it would have led to her finding at step three that Plaintiff's impairments meet the requirements of Listing § 12.04C, rendering him disabled. (*Id.* at 8 (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04C) (affective and depressive disorders)). Second, he insists that even were this not the case, the ALJ's failure to correctly consider the opinions of Dr. Rebeck and Kramer at step four still presented reversible error because the ALJ failed to articulate the rationale behind her decision. (*Id.* at 10-19).

The Commissioner responds that considered as a whole, and within the context of the ALJ's broader decision, her treatment of the two opinions was free from error. (Resp., ECF No. 11, at 6). As for supportability, he posits that the ALJ's reliance solely on normal mental status examination results throughout Dr. Rebeck's treatment notes in rejecting his opinion sufficed to comply with the regulations. (*Id.* at 7-8). Regarding consistency, the Commissioner highlights in relevant part that the ALJ determined Dr. Rebeck's opinion was "inconsistent with the findings from the psychological consultative examination including the ability to relate and exchange information independently and coherently, appropriate eye contact, clear sensorium, adequate expressive and receptive language, coherent and goal directed thought processes, and intact attention and concentration." (*Id.* at 7 (citing R. 28, 427-28)). In addition, the Commissioner

contends that Dr. Rebeck's opinion may be discounted given that it is a checkbox form. (*Id.* at 7 n.2).

To the extent that Plaintiff points to abnormal mental status examination results, the Commissioner counters that those results may be discounted because they predate Plaintiff beginning Lexapro and Concerta, which improved his symptoms. (*Id.* at 7-8 (citing Pl.'s Br., ECF No. 10, at 10)). Further, insofar as Plaintiff points to Dr. Rebeck's accompanying handwritten notes as additional support for the opinion, the Commissioner responds that they are "unconnected to any specific point in time" and thus "provide no value." (*Id.* at 7 n.2).

Turning to Kramer's opinion, the Commissioner contends that the ALJ's reliance upon normal mental status treatment notes from both Kramer and other medical sources satisfied the articulation standards contained in the regulations, and Plaintiff's contrary arguments amount to a request that this Court re-weigh the evidence and apply an enhanced articulation standard. (*Id.* at 8).

Plaintiff replies that the Commissioner failed to respond to his initial contention that the ALJ wholly ignored Dr. Rebeck's opinion that Plaintiff's mental impairments were "serious and persistent" at step three. (Reply, ECF No. 12, at 1-2 (citing R. 725)). According to Plaintiff, the Commissioner has therefore waived its opposition to this ground, warranting remand. (*Id.* at 2). Next, Plaintiff notes that the Commissioner's attempt to justify the ALJ's decision by pointing to the nature of Dr. Rebeck's handwritten notes fails for two reasons: (1) the Commissioner mischaracterizes the notes; and (2) the ALJ did not purport to rely on this rationale herself, making this a post hoc rationalization. (*Id.* at 3 n.1).

### 2.    Analysis

Though Plaintiff suggests that the aforementioned alleged errors affected the ALJ's analysis at both steps three and four, they all boil down to a singular challenge: the ALJ erred in

her evaluation of the medical opinion evidence.  For the reasons set forth below, I agree.

The Commissioner modified Social Security's regulations in 2017, changing the way ALJs evaluate medical evidence.  The prior regulations governing claims filed before March 27, 2017, divided medical sources into three categories: treating, examining, and non-examining.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).  ALJs were to weigh each medical opinion and could sometimes afford controlling weight to opinions from treating sources.  *See id.*

Under the new regulations, ALJs do not place medical sources into these categories and can no longer afford controlling weight to any opinion.  *See id.* §§ 404.1520c(a), 416.920c(a).  Instead, ALJs now evaluate the persuasiveness of each medical opinion and each prior administrative medical finding.  *See id.*  Five factors determine persuasiveness: (1) supportability; (2) consistency; (3) relationship with the claimant, including length, purpose, and extent of the treatment relationship, as well as frequency of examinations and whether the medical source examined the claimant firsthand; (4) specialization; and (5) other factors, like "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  *Id.* §§ 404.1520c(c), 416.920c(c). Supportability and consistency are the most important factors.  *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).  ALJs need not explain their determinations regarding the other factors, but they must discuss supportability and consistency.  *Id.*

Regarding supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1).  Regarding consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in

the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).

The ALJ alone is responsible for making disability determinations. In doing so, the ALJ is "free to accept some medical evidence and reject other evidence," so long as she "provides an explanation for discrediting the rejected evidence." *Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014). The ALJ has the duty to adequately explain the evidence that she rejects or to which she affords lesser weight. *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009). Although "any statements of the individual concerning his or her symptoms must be carefully considered," SSR 96-7p, 1996 WL 374186 (July 2, 1996), the ALJ is not required to credit them, 20 C.F.R. § 416.929(a). When formulating a claimant's RFC, the ALJ must include all credibly established limitations. *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)).

Initially, Plaintiff argues that in evaluating whether his mental impairments met the requirements of Listing § 12.04C, the ALJ "completely overlooked" Dr. Rebeck's opinion that his impairments were "serious and persistent." (Pl.'s Br., ECF No. 10, at 8 (citing R. 725; 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04C)). While it is true that the ALJ did not expressly mention the opinion of Dr. Rebeck in her step three analysis, when read "in context" and "as a whole," it is apparent that she considered the opinions of both Dr. Rebeck and Kramer and concluded that they were unpersuasive to the extent that they were inconsistent with at most moderate limitations in the four mental function areas, a conclusion consistent with her determination that his impairments did not meet the requirements of Listing § 12.04C. *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (holding that the regulations "do[] not require the ALJ to use particular language or adhere to a particular format in conducting his analysis" at step three] and further that it suffices that "there is sufficient development of the record and

explanation of findings to permit meaningful review [of the ALJ's decision when] read as a whole") (alterations added); *cf. Lawrence v. Kijakazi*, No. 22-cv-4995, 2023 WL 7129950, at *10 (E.D. Pa. Oct. 30, 2023) ("[A] reviewing court must be able 'to trace the path of an adjudicator's reasoning'") (quoting 82 Fed. Reg. 5844-01, at 5858) (alteration added). Nonetheless, remand is warranted for the reasons set forth below.

In discounting the two opinions, the ALJ relied almost entirely on normal mental status examinations and briefly noted Plaintiff's own reports at times throughout the record that his symptoms improved with medication. (*See* R. 27-28). In finding Dr. Rebeck's opinion unpersuasive, the ALJ stated in pertinent part:

> [T]he opinions of Dr. Rebeck [are] unpersuasive as they are unsupported by the doctor's treatment reports, which consistently reflected intact objective mental status examinations to include appropriate grooming, pleasant and cooperative behavior, good eye contact, normal speech, logical and goal directed thought process, no delusions or hallucinations, full orientation, good memory, and good insight and judgment. The opinions are also inconsistent with the findings from [Kramer's] psychological consultative examination including the ability to relate and exchange information independently and coherently, appropriate eye contact, clear sensorium, adequate expressive and receptive language, coherent and goal directed thought processes, and intact attention and concentration.

(R. 28 (citing R. 391, 406, 414, 427-28, 468, 484, 645, 661, 677, 685)).

Then in finding Kramer's opinion only partially persuasive, the ALJ stated in pertinent part:

> [T]he undersigned finds the opinions not persuasive regarding the marked limitations in responding appropriately as it is unsupported by the preceding clinical findings including the claimant's ability to engage in examination and his ability to relate and exchange information in a coherent manner despite being initially anxious upon presentation (Exhibit 3F/3). It is also inconsistent with the mental health treatment reports, which documented consistent engagement in treatment with noted symptomatic improvement with medication compliance.

(R. 27 (citing R. 398, 403, 408, 427, 457, 472, 480, 581, 641, 661, 665)).

This analysis is problematic for several reasons. First, as Plaintiff notes, the Third Circuit has held that for a person "who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic." *Morales*, 225 F.3d at 319. Therefore, normal mental status results and "observations that [a claimant] is 'stable and well controlled with medication' during treatment do[] not support the medical conclusion that [the claimant] can return to work." *Id.* Here, the ALJ deployed similar logic in relying almost entirely on Plaintiff's normal mental status results, (R. 28), and otherwise referenced Plaintiff's statements that his symptoms at times improved via medication, (R. 22, 25-26), but ultimately cited no other evidence to support her finding that the opinions were unpersuasive.[5] *See Morales*, 225 F.3d at 317-18 (noting that "[i]n choosing to reject [a] treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion").

Second, although the ALJ purported to rely upon mental status examination results in finding the two opinions unpersuasive, she provided no explanation why the results she cited were more credible than other mental status examination results (including from Dr. Rebeck himself) indicating abnormal results. (*See, e.g.*, R. 393-94, 400, 406-07, 427-28, 467, 645, 653, 668-69, 677-78). In fact, the ALJ acknowledged in other portions of her decision that the record contained such evidence, but completely ignored it when evaluating the persuasiveness of the two opinions. The ALJ was required to explain why she chose to focus on Plaintiff's normal

---

[5] Of note, the ALJ found Kramer's opinion partially persuasive. (R. 27). However, Plaintiff emphasizes that the portion of the opinion the ALJ found unpersuasive—that Plaintiff has marked limitations in his ability to respond appropriately to usual work situations and changes in a routine work setting—should have been found persuasive. (Pl.'s Br., ECF No. 14-19). This is the portion of the opinion at issue.

20

examination results while disregarding abnormal ones. *See Piper v. Saul*, No. 2:18-1450, 2020 WL 709517, at \*4 (W.D. Pa. Feb. 12, 2020) ("The ALJ is not entitled to 'cherry pick' favorable evidence and ignore records that run counter to her findings."); *see also Cotter v. Harris*, 642 F.2d 700, 704-06 (3d Cir. 1981) (noting the ALJ must explain both the evidence supporting her findings and the reasons for her decision); *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993) (the ALJ "cannot reject evidence for no reason or for the wrong reason") (citation omitted).

Finally, the ALJ's supportability analysis of Dr. Rebeck's opinion lacked any mention of his handwritten notes accompanying the opinion. (*See* R. 28). Dr. Rebeck specifically noted that Plaintiff was receiving medication and individual therapy at the time and explained that he was "easily distracted," "socially inappropriate," his "thinking [could] be disorganized and illogical," he had "problems with paying attention, concentrating, focusing, [and] completing tasks," and his "mood tend[ed] to fluctuate." (R. 725). These notes are precisely the type of supporting explanations that the ALJ is required to consider in analyzing the supportability of an opinion. *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

The ALJ was not necessarily required to credit Dr. Rebeck's explanations (or, for that matter, either opinion). However, she at the very least had to explain how she considered the relevant evidence (including Dr. Rebeck's supporting explanations and other mental status examination results that ran counter to those cited by the ALJ), and state how it affected the supportability and consistency of the opinions. *See id.* §§ 404.1520c(c)(1), 416.920c(c)(1); *see also Becker v. Comm'r of Soc. Sec.*, 403 F. App'x 679, 685 (3d Cir. 2010) ("To ensure meaningful review, the ALJ must discuss 'the evidence he considered which supports the result' and 'the evidence which was rejected,' and should give his reasons for accepting only some evidence while rejecting other evidence.") (citations omitted); *see Cotter*, 642 F.2d at 705 ("In the absence of such an indication, the reviewing court cannot tell if significant probative

21

evidence was not credited or simply ignored.").

The social security regulations "require, an ALJ to offer 'a narrative discussion describing how the evidence supports'" the limitations imposed. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019) (citing SSR 96-8P, 1996 WL 374184, at *7 (July 2, 1996)).  An "ALJ 'may not reject [a physician's findings] unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected.'" *Mason*, 994 F.2d at 1067 (quoting *Kent v. Schweiker*, 710 F.2d 110, 115 n.5 (3d Cir. 1983)); *see also Carter v. Railroad Retirement Bd.*, 834 F.2d 62, 65 (3d Cir. 1986).  The ALJ simply did not do so here.

To the extent the Commissioner attempts to avoid this conclusion by pointing to the fact that Dr. Rebeck's opinion was a checkbox form and was therefore less persuasive or the lack of temporal specificity in his accompanying explanations, (Resp., ECF No. 11, at 7 n.2), those two arguments fail because the ALJ herself did not purport to rely upon either as a basis for discounting the opinion. *See Schuster v. Astrue*, 879 F. Supp. 2d 461, 466 (E.D. Pa. 2012) (the Commissioner may not offer "a post-hoc rationalization" or justification because "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision") (quoting *Keiderling v. Astrue*, No. 07-2237, 2008 WL 2120154, at *3 (E.D. Pa. May 20, 2008)).

Ultimately, based on these errors, I conclude that the ALJ did not properly address the supportability and consistency of the two opinions at issue as required by 20 C.F.R. § 416.920c(c)(1)-(2).  In light of this failure, the Court remands this matter for a proper evaluation of those factors.

## B.    Plaintiff's Remaining Arguments

I write briefly to note Plaintiff's remaining arguments.  Plaintiff contends that the ALJ's failure to appropriately evaluate the evidence, including the opinions of Dr. Rebeck and Kramer,

22

resulted in an overstated RFC and subsequently a hypothetical question posed to the VE that did not adequately convey all of Plaintiff's credibly established limitations.  (Pl.'s Br., ECF No. 10, at 19-21).  He further argues that even assuming the RFC determination made by the ALJ was free from error, the VE's testimony regarding Plaintiff's ability to perform certain jobs available in the national economy did not constitute substantial evidence in support of the ALJ's step five finding because "the jobs cited by the [VE] could not be performed with [the] limitations" hypothesized by the ALJ.  (*Id.* at 21).  However, the Court need not decide whether these issues—which would be addressed later in the five-step analysis—constitute a basis for remand. If the ALJ determines on remand that proper consideration of the opinions of Dr. Rebeck and Kramer warrant a more restrictive RFC, Plaintiff's claim of an overstated RFC may fade away, as may his claim that the hypothetical flowing from that RFC fails to include all credibly established limitations or that the jobs cited by the VE do not align with these purported limitations.  *See Steinninge*r *v. Barnhart,* No. 04-5383, 2005 WL 2077375, at \*4 (E.D. Pa. Aug. 24, 2005) (not addressing additional arguments because the ALJ may reverse his or her findings after remand).  Accordingly, the Court does not consider these additional arguments at this time.

### C.    Remedy

As for Plaintiff's request that the Court "reverse the decision of the Commissioner and order that he be found disabled," (Pl.'s Br., ECF No. 10, at 24), I decline to grant such relief.  I find that remand—rather than an award of benefits—is the appropriate remedy.  An award of benefits is only appropriate, "when no evidentiary questions remain and the outcome of the case is dictated as a legal matter."  *See Freeman v. Berryhill*, No. 16-2610, 2017 WL 1351425, at \*7 (E.D. Pa., 2017) *report and recommendation adopted*, 2017 WL 1375185 (E.D. Pa. April 10, 2017); *see also Gilliland v. Heckler*, 786 F.2d 178, 184-85 (3d Cir. 1986) ("The decision to direct the district court to award benefits should be made only when the administrative record of

the case has been fully developed and when substantial evidence on the record as a whole indicates that the Claimant is disabled and entitled to benefits.") (citing *Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982)).  That is not the case in the instant matter.  On remand, the ALJ will further consider and weigh the medical source opinions as outlined in this Memorandum Opinion, which may affect the ultimate outcome of the case.  Consequently, an award of benefits would be premature in this instance.

## VI.     CONCLUSION

For the reasons set forth above, Plaintiff's Request for Review is **GRANTED**.  An appropriate Order follows.

BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge